**In re DEJA VU, INC., Debtor.**

**Bankruptcy No. 82–672–HL.**

United States Bankruptcy Court, D. Massachusetts.

May 1, 1984.

Joel Lewin, Snyder, Tepper & Comen, Boston, Mass., for debtor.

Roy D. Toulan, Jr., Natick, Mass., for claimant.

## MEMORANDUM ON THE PROOF OF CLAIM OF PAULA J. MODICA

HAROLD LAVIEN, Bankruptcy Judge.

Once again, the Court finds itself immersed in a controversy that arises from the intricate personalities involved in the Deja Vu—Harbour House "reorganizations." In this case, Paula Modica, former president of Harbour House Realty Corporation and Harbour House Operating Corporation, has filed a proof of claim in the Deja Vu case that alleges damages from an assault and battery with a dangerous weapon. The alleged assailant is Joseph Cataldo, former president of Deja Vu, Inc. Counsel for Deja Vu, Inc., timely objected to the proof of claim on February 2, 1984. On March 9 and 12, 1984, the Court held an evidentiary hearing where both sides presented conflicting testimony. At the conclusion of the hearing, the Court provided counsels with an opportunity to brief the issues and argue the facts as they saw them. Based on all of the evidence, the Court makes the following findings of facts and rulings of law.

About the only item agreed to by the parties is the date of the alleged incident— July 18, 1982. At that time, Joseph Cataldo, president, acting general manager, and 80% equity holder of Deja Vu, Inc., was utilizing the pool primarily for a private party for his daughter, while the lounge was serving regular customers. At approximately 8:00 P.M., the fire alarm went off. There was some testimony presented by Deja Vu's counsel that this was the fifth time within an hour that this occurred while the claimant believes this to be the only time it happened. The difference, however, is not necessarily material.[1]

In any case, Ms. Modica, from her station in the Harbour House facility,[2] was able to locate the origin in "zone 11", an area encompassing the second floor of Deja Vu and its kitchen area. Several phone calls to the Deja Vu lounge to check if there was any fire produced no results. Although Ms. Modica had the ability to turn off the alarm from her station, she alleged that proper procedure required her not to turn off any alarm until the fire department arrived and inspected the premises.

At this time, Joseph Cataldo, with his son, Stephen, entered the Harbour House lobby accusing Ms. Modica of turning the alarm on from her station and demanding that she now turn it off. Apparently, the fire alarm caused great confusion in the Deja Vu lounge, interfering with both Deja Vu's normal business and the party in progress. Joseph Cataldo quickly located the switch that controlled the alarm behind the front desk counter and turned it off— Mr. Cataldo testified that his son turned it off while Ms. Modica testified that Joseph Cataldo turned it off; again, a point that is not necessarily relevant to this Court's final determination.[3]

During this episode, Joseph Cataldo, according to his own testimony, "lost his temper." He states that he was on the same side of the counter as Ms. Modica had been and "pulled" the cash register toward him as it fell to the ground. He then pulled out the switchboard-telephone unit which he then threw against the wall. After that, he "ripped" out a message unit machine and threw that against the wall. He testified, however, that none of the objects hit Ms. Modica, either directly or indirectly. Moreover, he testified that he never physically touched her—his general moral attitude

---

1. For the purposes of this opinion, the Court will assume arguendo that the alarm went off only once during the evening.

2. Both the Harbour House Hotel and the Deja Vu lounge share the same physical structure. See this Court's Memorandum on Status of Deja Vu, Inc. re. Harbour House Operating Corp. and Harbour House Realty Corp., dated December 21, 1982 (82–00672–HL).

3. The Court notes that this was the testimony of Ms. Modica on the first day of hearing. The second day, Ms. Modica's testimony changed to include the role of Mr. Cataldo's son, in turning off the alarm. The Court, however, does not find this change particularly relevant.

prevented him from ever physically striking a woman.

Ms. Modica, of course, testified to a somewhat different version. She states that Mr. Cataldo, from the other side of the counter, "pushed" the cash register toward her. After hitting the floor, the register bounced onto her toes, breaking two of them. When Ms. Modica next made a motion to go toward the telephone to call the police, Mr. Cataldo came around to the same side of the counter as Ms. Modica, grabbed and pushed her against the wall. He, next, ripped out both the switchboard-telephone unit and the message unit machine and threw both toward Ms. Modica. Although none of the objects directly hit Ms. Modica, she testified that both hit her after they had bounced against the wall and were falling to the ground, injuring her shoulder, chest, arm and wrist. After this, both sides testified that Mr. Cataldo walked away, making further threats against Ms. Modica and Mr. Recklitis.

It is understandable how some inconsistencies in testimony could arise in light of the emotion present in such a situation. The inconsistencies relating to the injuries incurred, however, are not so easily reconciled. Moreover, both sides testified to witnesses who viewed the incident, yet neither side brought forth any witness to the incident to testify. Still, such failures do not allow the Court to avoid finding whether a battery did or did not take place. Claimant however, presented the testimony of a police officer who arrived shortly after the incident.[4] Although he had no personal knowledge of the incident, he did testify that Ms. Modica was very upset and had "fresh" scrapes on the shoulder and wrist. The officer's report, however, noted that the thrown objects had "narrowly" missed Ms. Modica. Still, such a notation does not exclude the possibility that the objects hit Ms. Modica on the "rebound."

■ The Court, after reviewing the testimony and demeanor of the witnesses, finds that Ms. Modica was injured by the acts of Mr. Cataldo. First, the police officer's testimony did indicate that Ms. Modica did possess "fresh" injuries, leaving little doubt that Ms. Modica was in fact injured. Although the police officer was not a medical expert, his testimony is still relevant. More important, Mr. Cataldo testified that he had "lost his temper." Even though Mr. Cataldo testified that he would never "think" of physically striking a woman, his admitted loss of control leaves sufficient doubt that he failed to realize what he was doing, specifically. Finally, Mr. Cataldo did admit to throwing the switchboard-telephone and message unit machine and forcing the cash register to the ground. Accordingly, the Court finds that Mr. Cataldo did commit a battery against Ms. Modica.[5]

■ Having found that Mr. Cataldo committed a battery upon Ms. Modica, the Court must now determine whether the debtor, Deja Vu, was responsible for the

---

**4.** Claimant also provided the testimony of an officer who arrived before the incident. This testimony, however, was not particularly relevant, although he did note that at this earlier time, Ms. Modica walked with no limp. This is relevant only in that Deja Vu's counsel presented vague allegations that Ms. Modica's injuries, particularly her toes, were incurred in an accident a few days before the July 18th incident. The Court, however, struck such testimony as hearsay at the time.

**5.** The Court notes that even if it found that no physical injuries were proven, there is ample support for a finding of mere assault—that is, that Mr. Cataldo intended to put Ms. Modica in apprehension of injury. Prosser, Torts, 4th Ed. 1982, § 10; *see also, Commonwealth v. Henson,* 357 Mass. 686, 259 N.E.2d 769 (1970) (criminal complaint); *Commonwealth v. White,* 110 Mass. 407 (criminal complaint) (1872). There is ample support for finding the necessary acts—the throwing of objects. Ms. Modica expressed fear, and intention is present in both Mr. Cataldo's loss of temper and expressed anger directed at both Ms. Modica and the Harbour House entities. Based upon a finding of assault and an additional finding of injury, the Court notes that it need not find an intention to injure to elevate the assault to a battery—intent is considered transferred. Prosser, Torts, § 8; *see also, Commonwealth v. Campbell,* 7 Allen 541, 89 Mass. 541 (1863) (criminal complaint). The Court, however, need not strain the facts to find a battery; there is ample support, as discussed above, to directly support a finding of a battery.

battery. The most recent and definitive case on corporate responsibility for torts committed by their employees is *Miller v. Federated Department Stores*, 364 Mass. 340, 304 N.E.2d 573 (1973). In a well reasoned and extensive opinion, Chief Justice Tauro discussed several of the Massachusetts cases. This Court need not repeat the Chief Justice's thorough analysis, it is sufficient to repeat the Court's articulation of its conclusion, that the question is "whether the assault was committed as a result of the plaintiff's conduct which *at the time of the assault* was affecting the employee's ability to satisfactorily do his job." *Id.* at 348, 304 N.E.2d 573. Perhaps more fully expressed:

> What must be shown is that the employee's assault was in response to the plaintiff's conduct which was presently interfering with the employee's ability to perform his duties successfully. This interference may be in the form of an affirmative attempt to prevent an employee from carrying out his assignments; as in the *Levi* and *Rego* cases, or in the failure to do acts necessary to enable the employee to begin or continue his assignments, as in the *Hobart* case. Assaults arising in either of these contexts constitute acts committed within the scope of employment, in that they stem from and directly relate to the frustration of the ability to perform on the assignments for which the employee is presently responsible.

*Id.* at 350, 304 N.E.2d 573.

■ At trial, and in its brief, Deja Vu's counsel argued that although the debtor may be responsible for any acts leading up to and including the turning off of the alarm, the debtor should not be responsible for any further acts. Arguably, the "impediment of interference" (to use debtor's counsel's words) with Deja Vu was the sound of the alarm, and that ended when the alarm was turned off. The Court cannot agree with such a reasoning—Mr. Cataldo was not concerned merely with turning off the alarm but with keeping it off and ending other activities which he and Deja Vu viewed as endangering their business future. The personal and business animosities between the Harbour House entities and the Deja Vu entities are well documented, both in this court and in state court. Accordingly, the Court finds that Deja Vu's purposes were not focused solely on the turning off of the alarm, but to insure a corporate and business environment free from continual interference from the Harbour House entities, no matter how legal Harbour House's activities were.

Deja Vu's counsel, however, argues that even if the actions in question were motivated by retaliation and deterrence, such actions are still not the responsibility of the debtor. As support, counsel cites *Brown v. Boston Ice Co.*, 178 Mass. 108, 59 N.E. 644 (1901), which states:

> It is not within the scope of the authority of a servant, to whose custody his master's property has been confided, to undertake to secure it from future injury by committing the illegal act of inflicting personal chastisement on persons who have done damage to it in the past.

*Id.* at 110, 59 N.E. 644. *Brown,* however, dealt with a child who had broken an axe entrusted to an ice deliveryman when it had been left temporarily unattended. When the deliveryman discovered the act, he struck the plaintiffs, admittedly to "teach them a lesson." In the case at bar, Mr. Cataldo's purpose was not merely to teach anyone a lesson, but to insure the success of the debtor, who had been continually frustrated by the activities of the Harbour House entities. Moreover, the broken axe of *Brown* was an isolated incident; the alarm of this case was only one element of many. Further, it is undisputed that the alarm was an interference that could be corrected—the broken axe could not be so easily corrected. Moreover, in light of the emotion present, the substantially simultaneous nature of the events, and the series of actions testified to, it is difficult, if not impossible, to separate the mere turning off of the alarm from the pushing and the throwing of the objects in question. Finally, the Court notes that Mr.

Cataldo was not merely an employee of Deja Vu, he was the president, acting general manager, and an 80% equity owner[6] of Deja Vu. Court wariness of imposing corporate liability for employee actions lies in its concern that corporations should not be responsible for actions of which they have no control over. Mr. Cataldo was not, however, a mere employee, and had principal control over the corporation. Although a corporation is still a separate entity, especially one in bankruptcy, the lines separating corporation and employees are especially vague when the actions complained of are those of the president-general manager-principal stockholder. Accordingly, the Court finds the debtor, Deja Vu, vicariously responsible for the action of Joseph Cataldo.

■ The Court is next concerned with the damages owed to Ms. Modica by Deja Vu. At trial, counsel for Ms. Modica presented no medical evidence as proof of damages.[7] Admittedly, counsel stated that little could be proven by such evidence— even if he could prove conclusively that Ms. Modica had broken two toes, the most he could prove was that Ms. Modica was ordered to "take it easy" for a few days. Accordingly, only Ms. Modica's testimony could establish her injuries. She testified that she was home, absent from work, for three to four days; she suffered some pain, primarily in her injured toes, in addition to her other scrapes and bruises on her shoulder, chest, arm and wrist; and, she had trouble sleeping for approximately one month. As to the last item, counsel to Deja Vu attempted to attribute the cause of Ms. Modica's sleeplessness to something other than assault and battery. Namely, he alleged that Mr. Cataldo made several verbal threats during the incident in question, and that Mr. Cataldo's brother made similar threats around the time of the inci-

dent. However, in light of the outrageous and violent nature of Mr. Cataldo's acts, I find that his assault and battery upon Ms. Modica was the direct and immediate cause of her restlessness.

This late in the twentieth century, civilized behavior must be more than a fancy garment to be discarded at the first sign of a storm. The brute force idolized on the frontier must be banished from any acceptable standard of conduct in our dealings with one another. The vicious and wild nature of Cataldo's attack cannot be brushed aside with the claim that his victim only received a few scratches, some minor bruises, perhaps a broken toe or two, and some sleeplessness. The verbal threats of physical, even fatal, harm were emphasized by her becoming the target of a flying cash register, a switchboard, and a telephone. Certainly, being roughly handled, verbally abused, life endangered and threatened, and watching Mr. Cataldo "rip" two objects from their sockets before hurling them at her, all in front of business associates, friends, and strangers, are enough to make Ms. Modica's claims of fear, humiliation, and sleepless nights a real and serious injury that the Court doesn't need expert testimony to understand.

■ How serious trauma, when added to the physical injuries incurred, can be translated into a dollar amount, is left to the sound discretion of the Court as the trier of fact. *Bresnahan v. Proman,* 312 Mass. 97, 101–02, 43 N.E.2d 336 (1942); *Pemberton v. Boas,* 13 Mass.App. 1015, 433 N.E.2d 490 (1982). The Court, of course, is not limited to nominal amounts. *Richmond v. Fiske,* 160 Mass. 34, 35 N.E. 103 (1893). Indeed, battery is not an injury that this Court or any court can condone. *In re Trudeau,* 35 B.R. 185, 188 (Bkrtcy.

---

6. At a more recent hearing, there was testimony that Mr. Cataldo owned only 20% of the Deja Vu stock. However, the 80% figure was uncontested at the hearing in question.

7. The Court notes that some hospital records were admitted. However, the purpose of these records was not to prove damages but, rather, as proof to other ancillary issues; namely, to

1983). Accordingly, I find for Ms. Modica in the sum of $5,000.[8]

The final issue left for this Court is the status of the counterclaims. The original objection to Paula Modica's proof of claim included four counterclaims. At the conclusion of the hearing on March 12, 1984, Deja Vu's counsel withdrew counterclaims 3 and 4. The parties agreed to brief the issue of whether the remaining two counterclaims were still relevant. The Court finds that they are not.

In short, the two remaining counterclaims request $86,000 in damages[9] for alleged acts committed by Ms. Modica while she was president of the Harbour House entities. Specifically, she is accused to have been involved in a conspiracy that at one point turned off the electricity in the Deja Vu lounge.

 As discussed above, the controversies and struggles between the Harbour House entities and Deja Vu is a matter well known to this Court, the state courts, and even the counsel before it, today. It reached a climax in this court during November and December of 1983 in hearings on Harbour House's objections to the proof of claim filed by Deja Vu in the Harbour House proceedings. After several hearings, with at least ten more full days of hearings to follow, the parties reached settlement. In the Joint Motion to Compromise Controversy, Deja Vu characterized its claim:

> (2.) The Claim consisted of the net recovery allowed by the Bankruptcy Court on December 21, 1982 in the sum of approximately $290,000, interest, *compensatory damages as a result of a contempt in the sum of $85,680,* and an unliquidated claim under various contracts to the undepreciated investment in the Harbour House premises after the fire at the premises, after crediting an

allocable portion of the amount allowed in the Court's December 21, 1982 order. (emphasis added)

In effect, counsel for Deja Vu now seeks to receive funds for damages that he already has compromised a claim for—that is, "compensatory damages as a result of a contempt in the sum of $85,680." This contempt finding, stemming from a state court proceeding, was originally adopted by this Court in its December 21, 1982 Memorandum. Deja Vu argues that its counterclaim sounds in tort while the contempt proceeding did not. The Court need not involve itself in a battle over the specific nature of the contempt. Suffice to say that the contempt proceedings allowed *compensatory* damages in the amount of $85,680. Although a plaintiff may proceed against joint tortfeasors, Moore's Federal Practice V, 3A § 19.11; a plaintiff is barred by satisfaction. *Old Dominion Copper Mining & Smelting Co. v. Bigelow,* 203 Mass. 159, 219, 89 N.E. 193 (1907) aff'd 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912). Deja Vu's compromise and settlement of its proof of claim is exactly that—satisfaction. Moreover, the counterclaim does not appear to be against Ms. Modica, personally, but, rather, against her in the capacity of president of Harbour House; in other words, against the Harbour House estate.

Accordingly, Paula Modica's proof of claim is allowed in the amount of $5,000 and the counterclaims are disallowed.

---

meet the contention that Ms. Modica's toe injury was the result of a previous accident.

**8.** Ms. Modica argued for $10,000; however, she offered no medical bills or expert testimony.

**9.** Specifically, objector, in his counterclaim, requested the amount of $86,000 in his first counterclaim—he omits any request in counterclaim 2. Based upon the structure of the debtor's counterclaims, the Court assumes that the $86,000 applies to the second counterclaim.